IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

    v.                                                         Criminal No. 3:22cr177 (DJN)

VICTOR MANUEL ROMERO-DIAZ,
        Defendant.

**OPINION**
**(Denying Motion to Dismiss Indictment)**

On November 15, 2011, the Department of Homeland Security issued a Final

Administrative Removal Order finding Victor Manuel Romero-Diaz deportable and ordering him

removed from the United States. Just over eleven years later, on December 6, 2022, a federal

grand jury indicted Romero-Diaz for one count of illegally reentering the United States in

violation of 8 U.S.C. § 1326. Romero-Diaz now moves the Court to dismiss the indictment on

either of two independent grounds. First, Romero-Diaz collaterally attacks the 2011 Final

Administrative Removal Order supporting his charge of illegal reentry. (Motion to Dismiss

("Mot." or "Motion") (ECF No. 23) at 6–9.) Second, he targets the illegal reentry statute itself,

arguing that § 1326 violates the Equal Protection Clause of the United States Constitution. (Mot.

at 9–10.)

On March 21, 2023, the Court held a hearing on Romero-Diaz's Motion. Upon due

consideration of the parties' papers and the relevant testimony given during the March 21

hearing, the Court finds that Romero-Diaz fails to meet his burden under either framework for

relief. Accordingly, and for the reasons set forth below, the Court will DENY the Motion to

Dismiss in full. (ECF No. 23.)

# I.   FACTUAL BACKGROUND[1]

## A.   2009 and 2011 State Criminal Convictions

On March 11, 2009, Romero-Diaz pleaded guilty and was convicted of one count of

felony possession of cocaine in the Circuit Court of Chesterfield County, Virginia.[2] (ECF No.

26-1; ECF No. 23-3, at 3.) A Spanish-fluent attorney, *supra* note 2, represented Romero-Diaz,

and he received the assistance of a certified Spanish translator. (*See* ECF No. 23-3, at 3

(reflecting the presence of Attorney Adams and Spanish interpreter Ana Romero).) On March

31, 2009, the court sentenced Romero-Diaz to ten years of incarceration, suspended for a period

of ten years, subject to an indefinite period of supervised probation.[3] (*Id.* at 4.) Following his

conviction, Romero-Diaz did not have any interaction with immigration officials, and he did not

appeal or otherwise challenge his plea, conviction or sentence.

On May 20, 2011, Romero-Diaz pleaded guilty and was convicted of one count of felony

possession of cocaine with intent to distribute in the Richmond City Circuit Court.[4] (ECF No.

23-3, at 1–2.) As before, Attorney Adams represented Romero-Diaz, and he received the

---

[1]    The Court draws the following facts from the parties' written pleadings and exhibits, as well as the testimony of Romero-Diaz and United States Immigration and Customs Enforcement ("ICE") Agent Christopher Kanauss during the March 21, 2023 hearing. (ECF No. 51.) The Court refers to the exhibits entered during the hearing as "Gov. Exhibit" or "Def. Exhibit," followed by the exhibit number.

[2]    Pursuant to his plea, Romero-Diaz signed a Waiver of Rights Form, (Gov. Exhibit 10), and a Plea Agreement, (ECF No. 26-1). Romero-Diaz testified that although his former counsel, Mary Adams ("Attorney Adams"), physically filled out the Waiver Form, she orally translated both forms for him before he signed them, that he could understand her translations and that he signed both forms.

[3]    Romero-Diaz claims that he believed that his 2009 plea had not resulted in a permanent criminal conviction; however, he concedes that neither his attorney nor the Circuit Court Judge told him that this was so. Rather, Romero-Diaz appears to have formed this impression without any basis, and the Court rejects his testimony on this point as incredible.

[4]    In exchange for his plea, the Commonwealth agreed to *nolle prosequi* a second possession of cocaine with intent to distribute charge. (ECF No. 26-1, at 2.)

assistance of a certified Spanish translator. (*Id.*) Pursuant to his written plea agreement, Romero-Diaz "acknowledge[d] that [Attorney Adams had] advised [him] of [the potential] immigration consequences [of his plea] pursuant to *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010)." (Gov. Exhibit 1.) Romero-Diaz testified that Attorney Adams warned him that he could potentially be placed on a "plane" and deported because of his conviction. By Order entered on June 13, 2011, the court sentenced Romero-Diaz to ten years of imprisonment, with nine years suspended. (ECF No. 23-3, at 1–2.) Again, Romero-Diaz did not appeal or otherwise challenge his plea, conviction or sentence.

### B.   2011 Administrative Removal Proceedings

On January 24, 2011, while Romero-Diaz remained detained in the Richmond City Jail on his then-pending state criminal charges, ICE agent Christopher Kanauss visited him. (Response in Opposition ("Resp.") (ECF No. 26) at 1.) At that time, Kanauss fingerprinted and photographed Romero-Diaz. Kanauss also spoke to Romero-Diaz in an attempt to ascertain biographical information about him,[5] such as when and where Romero-Diaz entered the United States and whether Romero-Diaz had any family members living here. (Resp. at 1.) Kanauss documented Romero-Diaz's "responses" on an English-language-only Record of Deportable/Inadmissible Alien Form ("Form I-213").[6] (Gov. Exhibit 2.)

---

[5]     Kanauss speaks only limited or "broken" Spanish.

[6]     Kanauss has no independent recollection of this encounter, but he testified to his "standard practice" during similar interviews. Specifically, Kanauss explained that local jail policy does not permit ICE agents to bring non-agent translators into the facility and that Kanauss would probably have conducted such a meeting without the aid of a translator. Kanauss further opined that he would only have entered information into the form based on the responses or non-responses given by the alien detainee and based on Kanauss's own visual observations. Notably, the completed I-213 Form does not reflect any particularized or detailed responses from Romero-Diaz. For example, the Form notes that Romero-Diaz entered the United States at an "unknown" location on an "unknown" date. (Gov. Exhibit 2, at 1–2.)

3

During the visit, Kanauss also provided Romero-Diaz with two forms:  (1) a list of free legal service providers, in English; and (2) a consular notification form, in both English and Spanish.[7]  (Gov. Exhibits 2A, 2B.)

Following Romero-Diaz's May 20, 2011 conviction in Richmond City Circuit Court for possession of cocaine with intent to distribute, ICE initiated expedited removal proceedings against him.[8]  (Mot. at 2; ECF No. 23-3, at 1.)  On November 15, 2011, Kanauss again met with Romero-Diaz, this time while Romero-Diaz was held in ICE custody.  As before, Kanauss maintains no independent recollection of this meeting, relying instead on his standard practice for such encounters.  In any event, the parties generally agree that Kanauss presented Romero-Diaz with several English-language-only forms relevant to his removal proceedings.

As most critical here, Romero-Diaz received and signed a Notice of Intent to Issue a Final Administrative Removal Order and Certificate of Service ("Form I-851" or "I-851").[9] (ECF No. 23-2, at 2, 4; Gov. Exhibit 3.)  In so signing, Romero-Diaz admitted "the allegations and charge [of deportability] in th[e] Notice" and that he was both deportable and ineligible "for any form of relief from removal."  (ECF No. 23-2, at 4.)  Further, Romero-Diaz waived his

---

[7]     Setting aside for the moment whether Romero-Diaz understood the substance and contents of both forms, Romero-Diaz's fingerprint reflects that he did, in fact, receive them. (Gov. Exhibits 2A, 2B.)

[8]     Section 1228 creates a presumption of deportability regarding an "alien convicted of an aggravated felony" and provides for the expedited removal of such persons.  Expedited removal proceedings are governed by Department of Homeland Security regulations set forth in 8 C.F.R. § 238.1.  (*Cf.* Gov. Exhibit 5 (Final Administrative Removal Order finding that Romero-Diaz "ha[d] a final conviction for an aggravated felony").)

[9]     Romero-Diaz also received a second form titled "Warning to Alien Ordered Removed or Deported" ("Form I-294").  The English-language form "displays . . . Romero-Diaz's signature," however, he contends that he did not receive a Spanish language copy of the form or a translation and notes that "the Spanish version of [the] form has not been provided to show [that Romero-Diaz received] the warnings contained in the form, that he elected to sign the Spanish version of the form, or that an interpreter was used in reading [him] the I-294."  (Mot. at 4.)

"right to rebut and contest" the charge of deportability, as well as his right to "remain in the United States for [fourteen] calendar days in order to apply for judicial review." (*Id.*)

The circumstances surrounding this waiver lie at the heart of Romero-Diaz's Motion. Romero-Diaz, who asserts that he does not read or understand English, testified that he did not receive a Spanish version of the Form I-851. (Mot. at 3.) Further, Romero-Diaz testified that no one translated the Form's contents for him. (*Id.*) In support, he notes that the officer who served the I-851, Kanauss, left the "box indicating in what language the form was explained to [Romero-Diaz] . . . blank." (*Id.*; ECF No. 23-2, at 4.) For his part, Kanauss testified that his standard procedure when encountering non-English speaking detainees is to either call in to a translator line or attempt to find a Spanish-proficient agent to assist him. Kanauss conceded, however, that he probably would have filled out the translator portion of the form had a translator been used and that his standard process would have been to fill out the "what language the form was explained in" line had anyone explained the form to Romero-Diaz in Spanish.

Following their encounter, Kanauss allowed Romero-Diaz to make a phone call. Although Romero-Diaz does not remember making the call, the Government produced an ICE Detainee Telephone Call Log (the "Call Log") , written in English and Spanish, reflecting that Romero-Diaz called his wife. (Gov. Exhibit 4.) Of note, Romero-Diaz completed portions of the Call Log himself by writing in his wife's first name and phone number. Kanauss testified that allowing a detainee to do so makes the process easier when language barriers make communication difficult.

After receiving the signed I-851, Assistant Field Office Director Matthew Munroe accepted Romero-Diaz's waivers, found him deportable and signed a Final Administrative Removal Order ("Form I-851A") that same day. (ECF No. 23-2, at 1.) Romero-Diaz made no

5

attempt to challenge his pending removal, and on or about December 12, 2011, the United States removed Romero-Diaz to his native El Salvador.[10]   (Mot. at 2.)

### C.     Subsequent Reentry and Federal Criminal Proceedings

Romero-Diaz allegedly reentered the United States on some unknown date thereafter, and on October 7, 2022, "ICE Fugitive Operations in Richmond, V[irginia] received a tip from the Chesterfield Sheriff's Office, advising them [that Romero-Diaz] was in the country."  (*Id.*) Accordingly, ICE agents began surveilling Romero-Diaz, and on December 6, 2022, a federal grandy jury indicted him on one count of illegal reentry following a felony conviction, in violation of 8 U.S.C. § 1326(a), (b)(1).  (*Id.*; ECF No. 3.)  ICE agents arrested Romero-Diaz on December 22, 2022.  (Mot. at 2.)

On February 17, 2023, Romero-Diaz filed the instant Motion to Dismiss the Indictment, attacking both his 2011 Final Administrative Removal Order and the illegal reentry provision of the Immigration and Nationality Act ("INA").  (ECF No. 23.)  The Government responded on March 2, 2023, and Romero-Diaz replied on March 7, 2023.  (ECF Nos. 26, 37.)

### II.     GROUNDS FOR ROMERO-DIAZ'S MOTION

Romero-Diaz moves the Court to dismiss his indictment on either of two grounds.  First, Romero-Diaz argues that his 2011 Final Administrative Removal Order is invalid, because authorities violated "his Due Process rights" by serving him "with a Notice of Intent to Issue a Final Removal Order, as well as a 'Warning to Alien Ordered Removed or Deported'" in a language that he could not understand and without the aid of a translator.  (Mot. at 6–7.)

Next, Romero-Diaz argues that § 1326 of the INA violates the Equal Protection

---

[10]     The Court accepts this fact for purposes of the Motion, but it notes that Romero-Diaz does not concede that the Government has established this fact beyond a reasonable doubt, as necessary for trial.

Clause pursuant to *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1997) (hereinafter "*Arlington Heights*"), because Congress passed the law with a discriminatory intent and the law has a disparate impact on Hispanic or Latinx persons. (Mot. at 9–10.) The United States opposes the motion as to both grounds.

### III.    SECTION 1326

Section 1326 of the INA sets forth criminal penalties for any noncitizen who:

> has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter . . . enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act.

8 U.S.C. § 1326(a).  Further, § 1326(d) defines the limited circumstances under which a defendant may collaterally attack his or her prior removal order, explaining that:

> an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that —
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).  The language of § 1326(d) makes plain that a defendant must satisfy all three statutory requirements.  *United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1620–21 (2021) ("The requirements [of § 1326(d)] are connected by the conjunctive 'and,' meaning defendants must meet all three.")  But, as relevant here, a defendant may satisfy certain requirements by demonstrating that his "underlying deportation proceeding was procedurally

7

flawed in a material way." *United States v. Segura-Virgen*, 390 F. Supp. 3d 681, 691 (E.D. Va.
May 16, 2019), *aff'd*, 799 F. App'x 214 (4th Cir. 2020) (citing *United States v. Moreno-Tapia*,
848 F.3d 162, 169 (4th Cir. 2017)).

## IV.   ANALYSIS

The Court addresses each of Romero-Diaz's two arguments in turn.  As explained below,
neither argument prevails.

### A.   Collateral Attack Pursuant to 8 U.S.C. § 1326(d).

Romero-Diaz first challenges the validity of his 2011 Final Administrative Removal
Order pursuant to 8 U.S.C. § 1326(d).  Because Romero-Diaz fails to establish by a
preponderance of the evidence that the entry of the Order was "fundamentally unfair," his claim
must fail. *See, e.g.*, *Segura-Virgen*, 390 F. Supp. 3d at 691 (explaining that a defendant bears the
burden of establishing that he has met the elements of § 1326(d) by a preponderance of the
evidence).

### 1.   Legal Standards

"A noncitizen charged with illegal reentry pursuant to 8 U.S.C. § 1326(a) must, as a
matter of due process, be able to 'collaterally attack the propriety of [his] original deportation
order in the later criminal proceeding.'" *United States v. Fernandez Sanchez*, 46 F.4th 211, 218
(4th Cir. 2022) (quoting *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005)); *see also
Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons'
within the United States, including aliens, whether their presence here is lawful, unlawful,
temporary, or permanent.").  To successfully undermine his prior removal order, a defendant
must satisfy all three requirements of § 1326(d) by demonstrating that:

8

(1) he "exhausted any administrative remedies that may have been available to
seek relief against the order;
(2) the deportation proceedings at which the order was issued improperly
deprived [him] of the opportunity for judicial review; and
(3) the entry of the order was fundamentally unfair."

*Fernandez Sanchez*, 46 F.4th at 218 (alteration in original) (quoting 8 U.S.C. § 1326(d)).

As discussed below, the Court finds that Romero-Diaz satisfies the administrative

exhaustion requirement of 8 U.S.C. § 1326(d)(1) by virtue of his expedited removal. *Infra*

Section IV.A.2.a; *see Segura-Virgen*, 390 F. Supp. 3d at 695 ("[I]n expedited removal

proceedings involving the I-851 form (as here), an alien need not have raised a legal challenge to

the expedited removal in order to satisfy an administrative exhaustion requirement because there

was no available administrative remedy.") (citing *Etienne v. Lynch*, 813 F.3d 135 (4th Cir.

2015)).

Romero-Diaz readily concedes that he did not seek judicial review of his Final

Administrative Removal Order. Indeed, via his signature on the Form I-851, Romero-Diaz

waived his right to "remain in the United States for [fourteen] calendar days in order to apply for

judicial review." (ECF No. 23-2, at 4.) Thus, to satisfy the second prong of § 1326(d), Romero-

Diaz must demonstrate that his waiver of the right to seek judicial review was "not considered or

intelligent." *United States v. Mendoza–Lopez,* 481 U.S. 828, 840 (1987). Plainly, if Romero-

Diaz did not speak or understand English in 2011, the *pro forma* "waiver of his right to judicial

review cannot have been 'considered [and] intelligent.'" *United States v. Garcia*, 2019 WL

4195345, at *10 (E.D. Va. Sept. 4, 2019) (alteration in original) (quoting *Mendoza-Lopez*, 481

U.S. at 840); *see also United States v. Reyes-Bonilla*, 671 F.3d 1036, 1044 (9th Cir. 2012)

(concluding that a similar waiver was not "considered or intelligent where there [wa]s no

evidence that the detainee was first advised of those rights in a language [that] he could

understand"). Romero-Diaz bears the burden to demonstrate the invalidity of his waiver.[11]  He

may satisfy his burden under § 1326(d)(2) by demonstrating that he could not read or otherwise

understand English during the relevant timeframe.[12]  *See Garcia*, 2019 WL 4195345, at *10

(quoting *Mendoza-Lopez*, 481 U.S. at 840); *cf. United States v. Aguilar-Lopez*, 2010 WL

3021876, at *2 (E.D. Wa. July 29, 2010) ("If a defendant's waiver of the right to appeal was not

'considered and intelligent,' he has satisfied the first two requirements of 8 U.S.C.

§ 1326(d) because he was effectively deprived of the right to both administrative appeal and

judicial review.")

      To establish fundamental unfairness, Romero-Diaz "must show that (1) his due process

rights were violated by defects in his underlying deportation proceeding, and (2) he suffered

prejudice as a result of the defects." *United States v. Herrera-Pagoada*, 14 F.4th 311, 320 (4th

Cir. 2021) (quoting *El Shami*, 434 F.3d at 664). "Due process requires, at a minimum, that an

alien [facing removal] be given '(1) notice of the charges against him, (2) a hearing before an

executive or administrative tribunal, and (3) a fair opportunity to be heard.'" *United States v.*

---

[11]      District Courts in the Fourth Circuit are split at to which party bears the burden of
demonstrating the validity of such a waiver. *Compare Garcia*, 2019 WL 4195345, at *11
(concluding that "the alien bears the burden to establish that his or her written waiver of
administrative or judicial review rights is invalid"), *with United States v. Lopez-Collazo*, 105 F.
Supp. 3d 497, 511 (D. Md. 2015) (concluding that the Government "bears the burden to prove
that any waiver was knowing and intelligent"). The Court concludes that *Garcia* reflects the
correct position and adopts the analysis set forth therein. *Garcia*, 2019 WL 4195345, at *10–11.

[12]      The Government does not assert that Romero-Diaz received either a copy of the Form
I-851 in Spanish or a translated explanation of its contents before he signed the waiver. Instead,
the Government contends that Romero-Diaz must have spoken or understood English sufficient
to waive his rights, because Agent Kanauss did not provide him with a translation. That is, had
Romero-Diaz *not* understood English, Kanauss would have ensured that any necessary
translations occurred and, thus, because no translation occurred, Romero-Diaz must have
understood English and properly waived his right to seek judicial review. (Resp. at 8.) In any
event, the Government readily concedes that this question presents an "issue of fact for the Court
to resolve," turning on whether Romero-Diaz understood English at the time of the waiver. (*Id.*)

10

*Lopez-Collazo*, 824 F.3d 453, 461 (4th Cir. 2016) (quoting *El Shami*, 434 F.3d at 665).

Accordingly, "an alien subject to expedited removal is entitled to 'the opportunity to be heard at

a meaningful time and in a meaningful manner.'" *Id.* (quoting *El Shami*, 434 F.3d at 664–65).

"Such a meaningful opportunity does not exist, however, when the alien does not understand the

proceedings without the aid of a translator." *Id.*[13] Thus, if the Court finds that Romero-Diaz

could not read or otherwise understand English in 2011, Romero-Diaz satisfies the first step of 8

U.S.C. § 1326(d)(3) as well. *See id.* at 462 (concluding that "DHS's failure to afford [the

defendant] a Spanish translation of [both] the charges in the [I-851] and his rights rendered [the

defendant's] removal proceedings defective and abridged his due process rights").

      Finally, "[t]o satisfy the second step of the fundamental-unfairness inquiry, 'a defendant

must show that he suffered actual prejudice as a result of the due process violations in the

removal proceedings.'" *Fernandez Sanchez*, 46 F.4th at 220 (quoting *Lopez-Collazo*, 824 F.3d at

462). To prevail, Romero-Diaz must demonstrate "that 'but for the [due process] errors

complained of, there was a *reasonable probability* that he would not have been deported.'" *Id.*

(quoting *El Shami*, 434 F.3d at 665). A "reasonable probability is a probability sufficient to

undermine confidence in the outcome." *United States v. Terrazas-Silas*, 811 F. App'x 845, 847

(4th Cir. 2020) (per curiam). Critically, Romero-Diaz must put forth more than a "generalized

showing of prejudice," by linking "the actual prejudice he claims to have suffered to the specific

due process violation at issue." *Fernandez Sanchez*, 46 F.4th at 220 (quoting *Lopez-Collazo*, 824

F.3d at 462); *see also United States v. Fernandez–Antonia*, 278 F.3d 150, 159 (2d Cir. 2002)

---

[13]    And indeed, DHS regulations explicitly require that officials "must either provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands." 8 C.F.R. § 238.1(b)(2)(v).

(citation omitted) ("Actual prejudice exists where defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.") "[T]hat link need not be ironclad," however, and Romero-Diaz "need not show with certainty that the violation altered the outcome." *Fernandez Sanchez*, 46 F.4th at 220.

As explained below, the Court finds that Romero-Diaz did not speak or understand English at the time of his waiver and that he thus satisfies the statutory requirements of 8 U.S.C. § 1326(d)(1)–(2). Further, for the same reason, the Court finds that Romero-Diaz satisfies the first step or "due process" element of the fundamental unfairness inquiry under 8 U.S.C. § 1326(d)(3). Finally, the Court finds that Romero-Diaz suffered no prejudice. Romero-Diaz does not establish that his failure to challenge his underlying state convictions was in any way related to the defects in his immigration proceedings. Furthermore, even if the Court accepted the dubious assertion that Romero-Diaz would have challenged those convictions if given the chance, Romero-Diaz cannot establish that such challenges would have forestalled his ultimate deportation. Accordingly, Romero-Diaz's collateral attack under § 1326(d) fails as a matter of law.

### 2. Discussion

#### a. Exhaustion of Administrative Remedies

Romero-Diaz challenges his prior Final Administrative Removal Order and asserts that the expedited proceedings satisfy, or is essence negate, the exhaustion requirement imposed under § 1326(d)(1). Accordingly, the nature of Romero-Diaz's immigration proceedings is relevant to his claim.

> In contrast to standard removal proceedings, expedited removal proceedings do not involve a hearing before an immigration judge. Rather, a DHS immigration officer determines whether the alien is removable as an "aggravated felon" under 8 U.S.C. § 1227(a)(2)(A)(iii), and, upon finding the alien removable "by

12

> clear, convincing, and unequivocal evidence," issues a "Final Administrative
> Removal Order" without referring the case to an immigration judge.
> Significantly, aliens subject to expedited removal are barred from discretionary
> forms of relief such as voluntary departure. *An alien subject to expedited removal*
> *cannot administratively appeal an adverse decision to the Board of Immigration*
> *Appeals*, but has a 14–day period "to apply for judicial review under 8 U.S.C.
> § 1252."

*Lopez-Collazo*, 824 F.3d at 457 (cleaned up) (internal citations omitted); *see also United States*

*Terrazas Siles*, 397 F. Supp. 3d 812, 819 (E.D. Va. 2019) ("Expedited removal orders are

generally not subject to administrative review.") (citing 8 U.S.C. § 1225(b)(1)(C)).

　　　Because Romero-Diaz did not have any avenue by which to administratively appeal his

removal proceedings, it follows that he satisfies § 1326(d)(1) as a matter of course. *See Segura-*

*Virgen*, 390 F. Supp. 3d at 697 (concluding that "in expedited removal proceedings involving the

I-851 form (as here), an alien need not have raised a legal challenge to the expedited removal in

order to satisfy an administrative exhaustion requirement because there was no available

administrative remedy"); *Garcia*, 2019 WL 4195345, at *9 ("In other words, because the I-851

form does not provide an administrative route to challenge the 'aggravated felony'

determination, the alien is excused from the administrative exhaustion requirement of 8 U.S.C.

§ 1326(d)(1).") (citing *Etienne*, 813 F.3d at 137–42); *but see United States v. Ortiz*, 488 F. App'x

717, 718 (4th Cir. 2012) ("Courts have generally held that the exhaustion requirement [of §

1326(d)(1)] must be excused where an alien's failure to exhaust results from an invalid waiver of

the right to an administrative appeal.").

　　　Accordingly, the Court finds that Romero-Diaz has satisfied the first prong of § 1326(d).

### b.　Deprivation of the Opportunity for Judicial Review

　　　As explained above, the inquiries underlying the Court's § 1326(d)(2) analysis (improper

deprivation of judicial review) and the first step of the Court's § 1326(d)(3) analysis (violation of

due process) are one in the same, *infra* Section IV.A.2.c.i., and each depends entirely on the Court's factual determination of whether Romero-Diaz could understand English at the time that he signed the Form I-851 in 2011. (*Cf.* Resp. at 7–10 (repeatedly asserting that this is a factual issue to be determined by the Court)); *United States v. Gonzalez-Ferretiz*, 2019 WL 943388, at *7 (E.D. Va. Feb. 26, 2019) (explaining that "[t]he fact that Spanish is [the defendant's] native language is not at all dispositive[, because w]hat matters is whether he also 'understands' English").

Put simply, if Romero-Diaz could not understand English in 2011, he was deprived of the opportunity for judicial review (§ 1326(d)(2)) and due process (§ 1326(d)(3)). Alternatively, if he could read or understand English in 2011, Romero-Diaz fails under both prongs.

In *Garcia*, the defendant argued that, because the I-851 was not explained to him in a language that he understood, his waiver of the right to appeal was invalid, and he was thus deprived of the opportunity for judicial review. 2019 WL 4195345, at *9–10. In support, the defendant presented the results of an "Oral Proficiency Interview," conducted nearly nine years after his deportation, and testimony of the doctor who conducted the evaluation. *Id.* at *11–12. The Court found this evidence insufficient to support the defendant's burden, because other evidence revealed that the defendant "spoke and understood English" at the time of his removal in 2010. *Id.* at *12. Specifically, the Court credited the testimony of the officer who served the I-851 that his standard practice, if the noncitizen preferred Spanish, was to "use the Spanish version of the I-851 form and call the 'language line' to have the I-851 explained to the alien in Spanish." *Id.* Further, the record showed that the defendant "was involved in state court proceedings in 2010," but "there [wa]s no evidence . . . showing that [he] required a Spanish-language interpreter during [those] proceedings." *Id.*

14

Unlike in *Garcia*, the Court finds that Romero-Diaz has met his burden to establish that his written waiver of judicial review is invalid. Romero-Diaz testified credibly under oath that he required and received translator services during both his 2009 and 2011 state court proceedings and that he did not receive any English-language instruction, including between 2009 and 2011.[14] Importantly, these assertions are supported by court records reflecting that he received such services during both state proceedings. (ECF No. 23-3, at 1–4.) Further, Romero-Diaz testified that no one explained the waiver form to him in Spanish, that he understood that it was a form relating to his ongoing immigration proceedings but not that it would lead to his immediate deportation without a hearing or other opportunity for review, and that he signed the form because he believed that he was required to do so.[15]

Further, no credible evidence undermines these assertions. Although Agent Kanauss proffered that, in keeping with his standard practice, he would have utilized the aid of a translator had he deemed it necessary to do so, several facts undermine this assertion. For one, Kanauss has no independent recollection of the specific events at issue here. Further, Kanauss conceded that he regularly conducts initial interviews with jail detainees without the aid of a translator, whether or not a translator would be useful, because outside translators are not allowed inside the jail. This fact is relevant, because Kanauss points to "responses" that Romero-Diaz allegedly gave during their initial meeting as evidence that Romero-Diaz did not require a translator. The Court finds that these responses represent little more than boiler-plate language reflecting non-

---

[14]     Romero-Diaz's counsel avows that Defendant "has needed the assistance of an interpreter throughout the pendency of the current proceedings." (Mot. at 7).

[15]     On this point, Romero-Diaz testified that Kanauss pointed to the form and repeated the word "sign."

answers.[16]  Moreover, Kanauss explained that he sometimes allows detainees to fill out portions of the Spanish-language Call Log — as he did here — when he and the detainee have difficulty communicating.  Finally, the Court notes that it had ample time to observe Romero-Diaz during his testimony and found his assertion that he could not speak or understand English in 2011 credible.  Based on the totality of the evidence, the Court finds that Romero-Diaz can neither speak nor understand English to the extent necessary to waive his rights in that language today and that he could not do so at the time that he signed the 2011 waiver.

Because Romero-Diaz's waiver of his opportunity to seek judicial review was neither knowing nor intelligent, the Court finds that his removal proceedings "improperly deprived him of the opportunity for judicial review" and that he has satisfied the requirement of § 1326(d)(2).  Nevertheless, the Court will deny Romero-Diaz's Motion, because, as discussed below, Romero-Diaz fails to demonstrate that the entry of his 2011 Final Administrative Removal was fundamentally unfair under § 1326(d)(3).

### c.    **Fundamental Unfairness**

Recall that to establish fundamental unfairness under § 1326(d)(3), Romero-Diaz "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice *as a result of the defects*." *Herrera-Pagoada*, 14 F.4th at 320 (quoting *El Shami*, 434 F.3d at 664) (emphasis added).

---

[16]    Indeed, at least one internal inconsistency within the Form I-213 itself calls the credibility of the "responses" contained therein into question.  For example, Kanauss noted on the first page of the I-213 Form that Romero-Diaz had one United States citizen child but noted on the second page that he had no family inside the United States.  (Gov. Exhibit 2, at 1–2.)  Further, although the I-213 appears to reflect that Romero-Diaz's wife resides in "El Salvador," the Call Log filled out on November 15, 2011 memorialized her United States telephone number.  (*Cf.* Gov. Exhibit 2, at 1; Gov. Exhibit 4.)

### i. Violation of Due Process

As explained *supra*, the government deprives an alien of the meaningful opportunity to be heard required by due process when it removes him from the country pursuant to proceedings that he cannot understand. Accordingly, because the Court finds that Romero-Diaz could not read or otherwise understand English in 2011, Romero-Diaz satisfies the due process component of 8 U.S.C. § 1326(d)(3). *See Lopez-Collazo*, 824 F.3d at 462 (concluding that "DHS's failure to afford [the defendant] a Spanish translation of [both] the charges in the [I-851] and his rights rendered [the defendant's] removal proceedings defective and abridged his due process rights"). *See supra* Section IV.A.2.b, for a discussion of the relevant analysis.

### ii. Prejudice

Under the second step of § 1326(d)(3), Romero-Diaz must demonstrate "that 'but for the [due process] errors complained of, there was a *reasonable probability* that he would not have been deported.'" *Fernandez Sanchez*, 46 F.4th at 220 (quoting *El Shami*, 434 F.3d at 665). Furthermore, Romero-Diaz must establish a causal link between "the actual prejudice he claims to have suffered [and] the specific due process violation at issue." *Id.* (quoting *Lopez-Collazo*, 824 F.3d at 462). Absent such a showing, his claim fails.

Romero-Diaz faces a hard row to hoe. The Court notes that Romero-Diaz does not contest that his prior conviction for possession of cocaine with intent to distribute was an aggravated felony supporting expedited removal. Indeed, Romero-Diaz's failure to identify any reason why he was not properly subject to expedited removal largely dooms his claim. Nevertheless, Romero-Diaz attempts to circumvent this reality by making the argument that:

> [t]he due process violation in this case actually prejudiced [him] by preventing him from [sic] seeking competent counsel to raise a challenge based on any misunderstanding that happened at the state level as it related to his guilty pleas and the immigration consequences that would stem from the same.

(Mot. at 9.)

In essence, Romero-Diaz contends that, if given the chance, he might have successfully challenged his prior state convictions on ineffective assistance of counsel grounds pursuant to *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010) (holding "that counsel must inform her client whether his plea carries a risk of deportation"). Had he so succeeded, the theory proceeds, Romero-Diaz would not have qualified for expedited removal.

For starters, Romero-Diaz fails to establish a reasonable probability that such a claim would have prevailed. Indeed, the Court notes that the Fourth Circuit has explicitly foreclosed any such argument regarding Romero-Diaz's 2009 conviction, because *Padilla*, decided in 2010, did not announce a retroactive rule of law. *Moreno-Tapia*, 848 F.3d at 165. Further, as explained above, *supra* page 2 and n.3, Romero-Diaz concedes that any misunderstanding regarding the finality of his 2009 conviction cannot fairly be traced to attorney error.

Further, even assuming, *arguendo*, that the Court could consider Romero-Diaz's 2011-based *Padilla* claim under § 1326(d), the Court finds no evidence that such a claim would have succeeded. To the contrary, the Government presents evidence that Romero-Diaz — who benefitted from the aid of a Spanish-speaking attorney and a translator during his state court plea and sentencing — acknowledged during his 2011 plea that he was advised of potential immigration consequences by his counsel pursuant to *Padilla*. (Resp. at 12; ECF No. 26-1, at 2.) Romero-Diaz himself testified to that effect.

Moreover, Romero-Diaz fails to explain how the opportunity to present such a claim in 2011 would have forestalled his ultimate deportation. Indeed, Romero-Diaz makes no showing

18

that "he would not have been removed even after a procedurally perfect removal proceeding,"[17]

*Fernandez–Antonia*, 278 F.3d at 159, instead, summarily concluding that "[b]ecause there was a

'reasonable probably that [his] deportation proceedings would have resulted in a different

decision, he has met his burden." (Mot. at 9.)  This self-fulfilling proclamation does not

approach the showing required by § 1326.

      Finally, and most critically, Romero-Diaz identifies no causal link between the violation

of his Due Process rights by Agent Kanauss and the prejudice that he allegedly suffered.

      In *Moreno-Tapia*, the Fourth Circuit addressed the question of "what effect the alleged

constitutional deficiency in [a defendant's] state convictions has on his subsequent prosecution

for illegal reentry."  848 F.3d at 165.  There, the defendant argued that his former counsel's

ineffectiveness violated *Padilla's* mandate that counsel must inform a criminal defendant of the

potential immigration consequences of his guilty plea.  *Id.* at 167.  After a North Carolina court

vacated the defendant's prior state conviction pursuant to *Padilla*, the defendant sought to

collaterally attack his federal indictment for illegal reentry under § 1326(d).  *Id.*  The District

Court for the Middle District of North Carolina rejected his argument, finding that the

defendant's "complaint was not with his immigration proceedings but rather his underlying state

---

17      And the Court fails to see how he could.  8 C.F.R. § 238.1(d)(2)(iii) provides that:

> [i]f the deciding Service officer finds that the alien is not amenable to removal
> under section 238 of the Act, the deciding Service officer shall terminate the
> expedited proceedings under section 238 of the Act and shall, where appropriate,
> cause to be issued a notice to appear for the purpose of initiating removal
> proceedings before an immigration judge under section 240 of the Act.

Romero-Diaz presents no argument that he was either (1) lawfully within the United
States or (2) eligible for any kind of relief, discretionary or otherwise.  Accordingly, based on the
facts before the Court, Romero-Diaz's ultimate deportation — whether subject to standard or
expedited proceedings — seems a foregone conclusion.

convictions." *Id.* at 168.[18]  On appeal, the Fourth Circuit affirmed on the basis that any alleged

infirmity in the defendant's state conviction had no effect on his current indictment, because

"*Padilla* does not apply retroactively to defendants . . . convicted before [*Padilla*] was decided."

*Id.* at 165.

      Although the core of the Fourth Circuit's holding is thus inapplicable to Romero-Diaz's

2011 claim, the Court finds the Fourth Circuit's analysis instructive.  As the Fourth Circuit

explained, Section 1326 is:

> concerned with failures of due process in an immigration proceeding that would
> make it fundamentally unfair to rely on a removal order coming out of that
> proceeding.  In particular, where a procedural defect in an immigration
> proceeding insulates the resulting order from judicial review, due process requires
> that the order be subject to collateral attack if it is relied on in a subsequent
> criminal prosecution.  That principle is broad enough, courts have held, that a
> failure to exhaust administrative remedies or seek judicial review as required by
> § 1326(d) will be excused, and a collateral attack permitted, where that failure is
> itself the product of a procedural flaw in the immigration proceeding.
>
> But this case . . . is quite different.  The thrust of [the defendant's] argument is not
> that his *immigration* proceedings were procedurally defective; it is that his
> underlying state *criminal* proceedings were rendered constitutionally infirm by his
> counsel's failure to inform him of the potential immigration consequences of his
> guilty plea.  At bottom, [the defendant] asks us to find that his immigration
> proceedings were fundamentally unfair . . . not because of any intrinsic
> procedural irregularity, but because they were predicated on unconstitutional state
> convictions.
>
> [Plainly,] there is an obvious mismatch between the kind of claim [the defendant]
> seeks to advance and the concerns of *Mendoza–Lopez* and requirements of §
> 1326(d).

*Moreno-Tapia*, 848 F.3d at 169 (internal citations omitted).

      So too here.  Romero-Diaz asserts that his prior removal was rendered fundamentally

---

18     The Court acknowledges that Romero-Diaz's case presents a different posture from
*Moreno-Tapia*, because the defendant there did not identify *any* procedural flaw in his prior
removal proceedings.

unfair by the attenuated possibility that he *might* have successfully challenged his 2011 state conviction had he been properly advised of his right to seek judicial review.[19]  However, a proper instruction on his right to appeal *his immigration proceedings* would not necessarily have directed Romero-Diaz toward the *Padilla* argument that he now advances, because immigration officials have no "duty to advise aliens of potential legal infirmities in [their] prior criminal proceedings." *Moreno-Tapia*, 848 F.3d at 169.  By so attenuating his claim of prejudice from his immigration proceedings, Romero-Diaz "impermissibly disconnects the prejudice analysis from the specific due process violation identified by the court." *Lopez-Collazo*, 824 F.3d at 465.  And, even assuming that a defendant could establish such a causal link, Romero-Diaz clearly has not done so here.  Accordingly, the Court finds that Romero-Diaz suffered no prejudice.

In sum, because Romero-Diaz fails to demonstrate fundamental unfairness as required by § 1326(d)(3), his collateral attack fails, and the Court will DENY his Motion as to this basis.

**B.      Equal Protection[20]**

Romero-Diaz next argues that the Court must dismiss his indictment because § 1326 violates the Equal Protection Clause.  This is so, the argument goes, because (1) Congress passed § 1326, and the law's predecessor as part of the Undesirable Aliens Act of 1929, for discriminatory reasons and (2) § 1326 continues to have a disparate impact Hispanic and Latinx persons today.  In what has arisen as a familiar posture in such cases nationwide, *see, e.g.*, *United States v. Barrera Vasquez*, __F.3d__, 2022 WL 3006773, at *1 n.2, *3 n.12 (E.D. Va.

---

[19]      As the Government points out, "Romero-Diaz did not appeal his prior felony convictions, nor has he sought to collaterally attack them in a habeas motion or any other avenue in the twelve years since his 2011 conviction and fourteen years since his 2009 conviction."  (Resp. at 12.)

[20]      During the March 21, 2023 hearing, Romero-Diaz declined to introduce any evidence or oral argument in favor of this part of his Motion, electing instead to rest on his papers.

July 28, 2022) (collecting cases), the parties disagree regarding the applicable standard of review

for such challenges.  In the interest of clarity, the Court will briefly address the competing

standards.  However, as discussed below, the Court declines to answer this question, because

Romero-Diaz's challenge fails under either test.

### 1.    Standard of Review

The Government argues that "Congress has broad authority over immigration policy as

an incident of its sovereignty, and 8 U.S.C. § 1326 is subject to rational basis review." (Resp. at

14.)  Conversely, Romero-Diaz contends that the Court must find the statute unconstitutional

under the framework set forth in *Arlington Heights*.

As the Court explained in *Barrera Vasquez,*

> [a] great deal of authority supports the [G]overnment's position that the Court
> should apply rational basis review.  The Supreme Court has "firmly and
> repeatedly endorsed the proposition that Congress may make rules as to aliens
> that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510,
> 522 (2003).  Accordingly, courts typically apply rational basis review when
> considering the constitutionality of immigration laws. *See Midi v. Holder*, 566
> F.3d 132, 137 (4th Cir. 2009) ("Although courts usually subject national-origin
> classifications to strict scrutiny, when such classifications involve unadmitted
> aliens in the immigration context, we subject them only to rational basis
> review."); *Appiah v. U.S. Immigr. & Nat'y Serv.*, 202 F.3d 704, 710 (4th Cir.
> 2000) (finding strict scrutiny inapplicable to a stop-time rule challenge because
> "Congress can favor some nationalities over others in immigration law"); *see
> also United States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012) (applying
> rational basis review to illegal alien's Fifth Amendment challenge to a law
> criminalizing possession of firearms because "no fundamental constitutional right
> [was] at stake").

> [To that end, some district courts have applied rational basis] review in this
> context because the plenary power doctrine mandates extreme judicial deference
> to Congress regarding matters of immigration and naturalization. [S]*ee Ping v.
> United States*, 130 U.S. 581, 603 (1889) (holding that the political branches of the
> federal government have plenary power to determine immigration law and policy
> as an attribute of state sovereignty) . . . .

22

[Defendant, in contrast, asks] the Court to find the statute unconstitutional under *Arlington Heights*.[21] *Arlington Heights* forbids the application of a statue adopted with discriminatory intent which disproportionately affects racial or ethnic groups of people. [But such a challenger] faces a steep hill to persuade the Court to apply *Arlington Heights*, because that case requires proof that the legislature adopted the law with invidious intent.

__F.3d__, 2022 WL 3006773, at *3 (some citations omitted).

## 2. Discussion

Romero-Diaz's challenge fails under either standard.

### a. Rational Basis

Rational basis review asks "whether [§ 1326] is, at a minimum, rationally related to legitimate governmental goals." *Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013). "[T]he government undoubtedly has a legitimate interest in deterring illegal reentry into the United States, and § 1326 rationally relates to that interest." *Barrera-Vasquez*, __F.3d__, 2022 WL 300677, at *4. Indeed, "it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined — all bark and no bite." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).

---

21    This position finds support as well. *See, e.g.*, *United States v. Zepeda*, 2021 WL 4998418, at *2 (C.D. Cal. Jan. 5, 2021), *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1071–72 (D. Or. 2021), *and United States v. Sanchez-Felix*, 2021 WL 6125407, at *3 (D. Co. Dec. 28, 2021) (applying *Arlington Heights*). Indeed, the argument in favor of rational basis largely relies on cases discussing Congress's power to directly regulate *civil immigration*. Section 1326 is not a civil law that aids in administering the immigration system of the United States, however. Rather, § 1326 authorizes the arrest, conviction, and incarceration of persons already within the United States and subject to certain constitutional protections. Further, a divided Supreme Court recently applied the *Arlington Heights* framework in assessing the equal protection claims of noncitizens in an administrative immigration context. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) (applying *Arlington Heights* to a claim that the Department of Homeland Security's rescission of Deferred Action for Childhood Arrivals ("DACA") violates the equal protection guarantee of the Fifth Amendment).

Section 1326 undoubtedly survives rational basis scrutiny.

### b.    Arlington Heights

To prevail under the *Arlington Heights* framework, a law's challenger must provide "[p]roof of racially discriminatory intent or purpose" on the part of the legislature who passed it. *Arlington Heights*, 429 U.S. at 265–66. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Unsurprisingly, defendants pressing such arguments typically present significant evidence regarding both the legislative history of the challenged provision and the ongoing effect of the law. Here, Romero-Diaz presents neither. Rather, Romero-Diaz asks this Court to "follow" the analysis employed by a Nevada District Court when it held 8 U.S.C. § 1326 unconstitutional in 2021. (Mot. at 10 (citing *United States v. Carillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021).) The Court declines this invitation.

Romero-Diaz fails to provide the Court with any evidence upon which it may properly analyze his *Arlington Heights* argument.[22] Accordingly, the Court finds that Romero-Diaz has not established facts supporting "a plausible inference that an 'invidious discriminatory purpose was a motivating factor'" in the passage of § 1326, *Regents*, 140 S. Ct. at 1915 (quoting *Arlington Heights*, 429 U.S. at 266), and will DENY his motion on this basis as well.

---

[22]     Romero-Diaz also mistakenly asserts that the court in *Barrera Vasquez* rejected a similar challenge, because "evidence specific to the defendant's case of the practical effects of discriminatory intent were not directly present." (Mot. at 10.) To overcome this perceived hurdle, Romero-Diaz contends that the Chesterfield County Sheriff's Department's decision to check his immigration status was "discriminatory in nature" and "clearly directed at targeting the Hispanic community." (*Id.*) Romero-Diaz provides no explanation for how the actions of the Chesterfield County Sheriff's Department in 2022 bear upon the constitutionality of a federal statute, the motivations of the Congress who passed it or the impact of the statue upon Hispanic persons.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Romero-Diaz failed to establish that the entry of his prior Removal Order was fundamentally unfair under 8 U.S.C. § 1326(d)(3). Further, the Court rejects Romero-Diaz's invitation to strike down § 1326 as unconstitutional, or to even consider doing so, on the non-existent evidentiary record before it.  Accordingly, the Court will DENY the Motion to Dismiss the Indictment on both grounds.  (ECF No. 23.)

An appropriate Order shall issue.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: April 4, 2022

25